**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. WDQ-13-0620** |
| **KENNETH GRAHAM,** | * | |
| | * | |
| **Defendant.** | * | |

...oooOooo...

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT
GRAHAM'S PRETRIAL MOTIONS**

The United States of America, by and through its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland and Seema Mittal and Benjamin M. Block, Assistant United States Attorneys for said district, submits this response to various pretrial motions filed by the Defendant and requests that the Court deny all of the Defendant's motions.

**I.   INTRODUCTION**

On November 6, 2013, defendant Kenneth Graham ("Defendant") was charged in a three-count Indictment relating to an armed Hobbs Act robbery committed in Baltimore City, Maryland, on September 17, 2013.   The Defendant is charged with one count of attempting to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of using or carrying and discharging a firearm during and in relation to, or possessing and discharging a firearm in furtherance of, a crime of violence, in violation of 18 U.S.C. § 924(c); possessing a firearm after having previously sustained a felony conviction, in violation of 18 U.S.C. § 922(g)(1); and aiding and abetting each of these three counts.   A trial in this matter has been set for May 5, 2014.

The Defendant has filed a variety of pre-trial motions, which include a motion requesting that the United States provide Notice of Rule 404(b) evidence that it intends to use at trial (ECF No. 20 and a duplicate filing at ECF No. 27); a motion for leave to file additional motions (ECF

No. 21); and separate motions to suppress: identification evidence (ECF No. 22), Graham's

statements made to law enforcement (ECF No. 24), and search and seizure of evidence (ECF No.

26).   A hearing on the Defendant's motions is set for May 5, 2014.

## II.   FACTUAL BACKGROUND

### A.   The September 17, 2013 Attempted Robbery and Shooting and the Defendant's Arrest

A little before midnight on the night of September 17, 2013, an individual later identified

as Kenneth Graham used a gun to try to force his way into and rob a home located at 1046 Bethune

Road ("1046 Bethune") in the Cherry Hill neighborhood of Baltimore, Maryland.   The owner was

known in the community to run a "convenience store" out of her home, selling food stuff, tobacco,

and other products.   Individuals inside 1046 Bethune attempted to shut the door on Graham, who

had one foot stuck between the door and the doorway.   Graham reached the gun around the door

and fired three shots into 1046 Bethune; one of the bullets struck a 9-year old boy.   Graham fled

the scene, leaving behind his tennis shoe, which was still stuck between the door and the doorway.

At approximately 11:51 p.m., two individuals who had been inside 1046 Bethune during

the attempted robbery and the shooting separately called 911, which then dispatched a call for

police assistance.   At that time, Detective (then Officer) Ryan O'Connor was monitoring the

closed captioned television ("CCTV") system that monitors the Cherry Hill community.   Upon

hearing the call for police assistance for a shooting at 1046 Bethune, Detective O'Connor

immediately used the CCTV system to monitor the area for any suspicious activity.   Detective

O'Connor saw no activity on Bethune Road.   Because the address was located near the railroad

tracks that create the western border of Cherry Hill, Detective O'Connor turned to a camera

located on the rear side of the 1200 block of Slater Road, which is approximately 0.5 miles north of

1046 Bethune and along the railroad tracks.   At approximately 11:55 p.m., Detective O'Connor

saw Graham running along a path on the rear side of the 1100 block of Slater Road.   Detective

O'Connor radioed via KGA to report what he had seen and directed officers to that area.

Detective O'Connor then saw Graham run towards a wooded area, where he was out of camera

view for several seconds before re-emerging.   Graham then continued towards the front of 1207

Slater Road ("1207 Slater") and began to unbutton his shirt.

Detective O'Connor then switched to monitor the camera located in front of 1207 Slater.

He observed that Graham's shirt was unbuttoned and that he appeared not to have any shoes on.

Without using a key, Graham entered 1207 Slater.   Detective O'Connor directed officers to 1207

Slater over KGA.   Detective O'Connor continued to monitor 1207 Slater and saw a woman exit

the residence.   Immediately after, Graham stuck his head out of the doorway and looked to the left

and right down both sides of the street twice before he went back inside the house.   Graham

appeared to be out of breath and panting.

BPD officers immediately responded to 1207 Slater.   Armed officers knocked on the front

door and called for Graham to come outside.   Graham is captured on CCTV opening the window

of the upstairs bathroom and sticking his head out to speak with the officers.   The officers directed

Graham to come downstairs.   Graham stated, "I am taking a shower what's wrong?"   (Officer

Daniel Marcoullier Supplemental Report, attached as Exh. 1).   At that time, two women opened

the front door and exited the residence.   A few moments later, Graham came to the front door

wearing only shorts, and officers placed him in custody on the front lawn of the house.   Graham

stated, "Hey Marcoullier what's wrong I have been here the whole time taking a shower."   (Ex.

1).   Officers then entered 1207 Slater to secure the residence while other officers sought and

obtained a search warrant.   The residence was not searched prior to obtaining the search warrant.

3

During the investigation, BPD officers located camera footage of Graham at approximately 11:54 p.m in an open field area along the path between 1046 Bethune and 1207 Slater.   The video captures Graham removing a gray hoody he was wearing and leaving it behind on the ground.   At approximately 3:48 a.m., officers recovered the hoody.   Officers also recovered a Smith & Wesson .357 revolver containing three live rounds and three shell casings in the wooded area behind the 1100 block and 1200 block of Slater Road, where Detective O'Connor saw Graham run off-camera.   Behind 1101 Slater Road, in the path that Graham was seen running along, officers recovered a tennis shoe matching the tennis shoe left behind at 1046 Bethune by the assailant.

### B.      Graham's Statement

Graham was transported to the Baltimore Police Department's Southern Division Station to be interviewed.   Before commencing any custodial interview of Graham, Detective William Bailey informed Graham of his *Miranda* rights, which rights Graham waived.   Specifically, Graham signed an Explanation and Waiver of Rights Form, acknowledging that he had "been advised of and understood [his] rights" and "freely and voluntarily waive[d] [his] rights and agreed[d] to talk with the police without having an attorney present."   (September 18, 2013 Explanation and Waiver of Rights Form, attached as Exh. 2).   Graham also initialed the page to indicate each right of which he had been advised by Detective Bailey.   At the beginning of the custodial interview, Lieutenant William Simmons confirmed that Graham was aware that the interview was being recorded and reviewed the Explanation and Waiver of Rights Form with Graham again, re-reading each of the rights of which Graham had been advised and confirming that Graham initialed or signed next to each of those rights that he was waiving.   At that time, the questioning began and the interview lasted for approximately ninety minutes before it was terminated by Lieutenant Simmons.

### C.      Baltimore City Search Warrants

The Baltimore Police Department sought and obtained search warrants for 1207 Slater, 1046 Bethune, and Kenneth Graham's DNA.   At issue are the warrants for 1207 Slater and for Graham's DNA.   These warrants are attached as Exhibits 3 and 4, respectively.   Both searches occurred on September 18, 2013, just hours after the attempted robbery and shooting.   During the search of 1207 Slater, officers recovered a plaid shirt, jeans with $15.00 in a pocket, socks, underwear, two identification cards, two letters, and one pair of Nike tennis shoes.   Pursuant to the search warrant for Graham, officers collected two left cheek and two right cheek DNA swabs.

### D.      Eyewitness Identifications

During the course of the investigation, law enforcement officers interviewed several individuals regarding the September 17, 2013 incident.   Four witnesses were presented a six-pack photo array.   Each of the individuals was first shown and read the following paragraph:

> The six photographs on this form may or may not contain a picture of the subject in connection with this investigation.   When looking at the photographs, keep in mind that individuals may not appear exactly as they did on the date of the incident because features such as hairstyles and facial hair (beards and mustaches) may be changed.   Photographs may not always depict the true complexion of the person and can be affected by the quality of the photographs.   After viewing each photograph, please indicate whether you have made any identification in connection with this investigation.

The individuals were then asked to initial next to the paragraph, acknowledging that they understood it.   An officer then flipped the page to show six photos arranged in two rows of three photos, each of different individuals.   The viewer was then asked whether he or she could identify any of the individuals in the photos.   In the comment box on the first page, the viewer then recorded his or her answer.   The four photo arrays are attached as Exhibits 5, 6, 7, and 8.   Of the four photo arrays, the Government only intends to utilize three at trial because one witness saw a

photo of Graham on the news prior to being shown the photo array.

## III.   LEGAL ARGUMENT

### A.   The Government Hereby Discloses its Intention Regarding the Use of 404(b) Evidence.

Graham has requested notice of the Government's intention to utilize Federal Rule of Evidence 404(b) evidence at trial.   The Government makes its initial disclosure here.   The Government does not intend to make use of FRE 404(b) evidence, specifically, evidence of prior firearm or narcotics convictions.

Although the Government believes the following is not *Brady* material, the Government, being overly cautious, disclosed to the Defendant that an individual stated that he or she did not know Graham to possess a gun or to engage in robberies.   However, as is clear from Graham's prior convictions and from statements made during his interview with BPD, Graham has possessed guns on multiple occasions.   Indeed, during his interview, Graham admitted not only to possessing a gun on the night of the shooting but also to discarding the gun in the wooded area behind 1207 Slater, as was seen on CCTV.   Moreover, other evidence contradicts the witness's assertion that he or she does not know Graham to have engaged in robberies.   Therefore, the Government reserves the right to introduce evidence of Graham's firearm convictions and prior participation in robberies if Graham elicits on direct or cross examination testimony that Graham was not known to have or was not previously involved with firearms, or never previously engaged in robberies.

### B.   The Identification Evidence Was Not Impermissibly Suggestive and Should Be Admissible At Trial.

At this time, Graham has not moved to suppress the identification evidence because at the time of the filing of the motion, Graham contends he was not in possession of discovery materials

6

to determine whether the procedure used by law enforcement officers was impermissibly

suggestive.   Instead, Graham filed this motion to preserve his right to object to any deficiencies.

The exclusion of identification evidence is a "drastic sanction" that is "limited to

identification testimony which is manifestly suspect."   *Harker v. Maryland*, 800 F.2d 437, 443

(4th Cir. 1986).   The law is long-settled that eyewitness identification testimony is admissible

unless the identification procedure was "so impermissibly suggestive as to give rise to a very

substantial likelihood of irreparable misidentification."   *Simmons v. United States*, 390 U.S. 377,

384 (1968).   "The Due Process Clause is not implicated, however, if the 'identification was

sufficiently reliable to preclude the substantial likelihood of misidentification.'"   *United States v.*

*Saunders*, 501 F.3d 384, 389 (*quoting United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997))

(concluding that even though a single-photo display was impermissibly suggestive, the

identification was still reliable and did not violate due process).   Therefore, the Court must apply

a two-step analysis.   First, the Defendant "must prove that the identification procedure was

impermissibly suggestive."   *Holdren v. Legurksy*, 16 F.rd 57, 61 (4th Cir. 1994).   "A procedure

is unnecessarily suggestive if a positive identification is likely to result from factors other than the

witness's own recollection of the crime."   *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997).

If it was not, the inquiry ends.   If the procedure was impermissibly suggestive, "the court then

must determine whether the identification was nonetheless reliable under the totality of the

circumstances."   *Holdren*, 16 F.3d at 61; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977);

*Neil v. Biggers*, 409 U.S. 188, 199 (1972).

The four individuals who were shown photo arrays were shown these photo arrays

separately and not in the presence of each other.   Each was shown the photo array in the same

manner.   Witnesses will testify that circumstances around the showing of the four photo arrays

7

were as follows:

Prior to showing any photos, each individual was first shown and read the following

paragraph by a law enforcement officer:

> The six photographs on this form may or may not contain a picture of the subject in connection with this investigation.   When looking at the photographs, keep in mind that individuals may not appear exactly as they did on the date of the incident because features such as hairstyles and facial hair (beards and mustaches) may be changed.   Photographs may not always depict the true complexion of the person and can be affected by the quality of the photographs.   After viewing each photograph, please indicate whether you have made any identification in connection with this investigation.

The officer then asked each individual to initial next to the paragraph, acknowledging that they

understood it.   The officer then flipped the page to show six photos arranged in two rows of three

photos, each of different individuals.   The viewer was then asked whether he or she could identify

any person in the photos.   In the comment box on the first page, the viewer then recorded his or

her answer.

The identification procedure used by law enforcement is far from suggestive.   Although

the viewers were aware that a suspect had been arrested, the instructions specifically warn that the

six photographs may or may <u>not</u> contain a photo of the subject of the investigation.   This

instruction, which was given pursuant to Baltimore Police Department policy, alleviates a concern

that the viewer may feel pressure to identify an individual in the photo array.   Further, as can be

seen from Exhibits 5, 6, 7, and 8, the photos used in the photo arrays are not suggestive.   Each

photo array contained the same six photos although not in the same order.   Three photos are of

individuals in white tops and three photos are of individuals in black tops.   In each photo array,

the three photos of individuals with white tops are always together and the three photos of

individuals with the black tops are also always together.   Although each photo is of a different

person, unlike in *Saunders*, Graham's photo does not look strikingly different than the others.   *See Saunders*, 501 F.3d at 390.   Indeed, they each have the same hairstyle and facial hair, as well as similar facial features, complexion, and pose.   Also different from *Saunders*, the backgrounds of the photos are similar in color.   *See id.* (holding the photo array to be suggestive in part because the defendant's photo had a dark background while the filler photos had a light background).

Accordingly, the identification procedure used here was not suggestive and, therefore, a motion to exclude would be futile.   Nevertheless, the Government will voluntarily forgo the use of one of the four photo arrays because, prior to viewing the photo array, the witness saw Graham's photo on the news.   This fact was not known to the Government at the time of the photo array.

**C.      Graham's Motion to Suppress Statements Made to Law Enforcement Should Be Denied.**

**1.      Graham's Statements Were Not Made As The Product Of an Illegal Arrest.**

**a.      Probable Cause Existed to Arrest Graham and, Therefore, Graham's Statements Should Not Be Suppressed.**

Graham's motion "asserts in general" that statements made to law enforcement authorities at the police station were obtained as the product of an illegal arrest.   Although Graham fails to include a specific argument as to why the arrest was illegal, the Government assumes that Graham's argument is that law enforcement arrested Graham without a warrant.

A warrantless arrest—and search incident to arrest—is permitted "where there is probable cause based on a subjective standard to believe a felony is being or has been committed by the arrested individual, based upon the totality of the circumstances."   *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001); *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983).   As the Supreme Court

explained in *Gates*, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.   The Fourth Circuit has articulated the probable cause standard as "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."   *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).   Probable cause is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life."   *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).   As the Fourth Circuit has reasoned:

> In assessing the totality of the circumstances, it is appropriate to consider specifically: an officer's practical experience and the inferences the officer may draw from that experience; or the context of a high-crime area; or an individual's presence in a high-crime area coupled with his headlong flight upon noticing police; or evasive conduct that falls short of headlong flight; or even seemingly innocuous activity when placed in the context of surrounding circumstances.

*United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (internal citations and quotation marks omitted).   "Stripped to its essence, the question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a 'reasonable ground for belief of guilt' that was 'particularized with respect to the person to be searched or seized.'"   *Id*. (quoting *Pringle*, 540 U.S. at 371).

A reasonable police officer, placed in these circumstances, would certainly come to the same conclusions as the officers did here—that there was a reasonable ground for belief that Graham had just committed a felony shooting at 1046 Bethune.   First, a call over the KGA reported a shooting—a felony offense—of a 9-year old boy in the abdomen at 1046 Bethune.   The report indicated the shooter was a man wearing dark clothing.   Detective O'Connor saw no suspicious activity on Bethune Road nor did any other officers patrolling the Cherry Hill

neighborhood report suspicious activity after the KGA call reporting the shooting went out.

Graham was then seen on CCTV wearing what was described on the KGA as dark clothing while

running late at night during, what law enforcement will testify as being, a normally quiet time in

Cherry Hill.   Second, the shooting occurred at a residence located near the railroad tracks and

Graham was seen running near an area along the railroad tracks.   Law enforcement will testify

that they were aware that the location of the shooting was near the railroad tracks that line the

western border of Cherry Hill and that, historically, when shootings and robberies occurred in the

Cherry Hill neighborhood, the culprits used the railroad tracks to flee.[1]   A reasonable officer

could conclude that Graham had used the area along the railroad tracks to flee from the shooting.

Third, Detective O'Connor observed Graham run into a wooded area off camera briefly before he

ran back on his path to 1207 Slater.   A reasonable officer could conclude that such behavior,

especially at that time of night, was suspicious.   Fourth, after Graham entered 1207 Slater,

Detective O'Connor observed Graham stick his head out of the doorway, out of breath and

panting, looking to the left and right down both sides of the street twice, before going back inside

the house.   A reasonable officer could conclude that this behavior was also suspicious and

indicated that Graham was looking to see if the police were following him.   Lastly, law

enforcement officers will testify that they knew the suspect was Graham by his face and his

residence, and that they were familiar with Graham based on his past criminal activity and

association with others who have engaged in criminal activity.   Law enforcement officers will

testify that they thought it was not only suspicious to see anyone running in the area near the

---

[1]      Cherry Hill is divided into two parts:   "Up the Hill"—the north side of Cherry Hill, and "Down the Hill"—the south side of Cherry Hill.   Law enforcement officers will testify that when shootings and robberies occur in the Up the Hill area, they are usually committed by individuals living Down the Hill, and vice versa.   These culprits are both rumored to use and have been caught using the railroad tracks as an escape route as police vehicles cannot access the grassy area.

railroad tracks at that time of night, but that it was even more suspicious that Graham was running because he was not the type to run unless there was criminal activity afoot.

For all of these reasons, the law enforcement officers had probable cause to believe that Graham had just committed a felony, and, therefore, were permitted to arrest Graham without a warrant.[2]   Thus, Graham's motion to suppress his statements should be denied.

> **b.      Exigent Circumstances Also Supported Graham's Warrantless Arrest, and, Therefore, Graham's Statements Should Not Be Suppressed.**

To the extent that Graham is arguing that the arrest was made in Graham's residence[3] and, therefore, required exigent circumstances in addition to probable cause, his argument is misplaced. Graham is correct that an arrest warrant is required for an arrest inside an arrestee's home, even when probable cause exists, unless there are exigent circumstances.   *Payton v. New York*, 445

---

[2]      In Graham's motion to suppress search and seizure evidence, Graham includes a brief argument that law enforcement officers lacked probable cause to search Graham without a warrant at the time of his arrest and, accordingly, any evidence taken from his person should be suppressed.   Specifically, Graham contends that clothing and $15.00 were seized from Graham at the time of his arrest.   Because the arrest was supported by probable cause, any search incident to arrest was lawful.   *See Park*, 250 F.3d at 850; *Gates*, 462 U.S. at 230-31.   However, no evidence was taken from Graham at the time of his arrest.   Law enforcement officers seized from inside 1207 Slater clothing and $15.00 from a pant pocket pursuant to the search warrant for 1207 Slater. Additionally, Graham contends that law enforcement officers searched Graham's residence at the time of the arrest.   Although officers entered the home to secure the premises while other officers went to obtain a search warrant, no search was conducted until after the search warrant was obtained.

[3]      For purposes of this motions response, the Government will treat 1207 Slater as Graham's residence.   However, the Government does not concede that 1207 Slater is in fact Graham's residence.   The residence belongs to Martinique Bishop, who shares the home with her daughter, Brittany Bishop, and other relatives.   Brittany Bishop is Graham's girlfriend, with whom he has a child.   Graham, for the most part, stays with Brittany Bishop; however, he does not have a key to the residence.   Therefore, it is unclear whether it is his home.   Additionally, because Graham is a frequent overnight social guest, the Government does not oppose his standing to challenge the search warrant for 1207 Slater.   *See United States v. Gray*, 491 F.3d 138, 145-46 (4th Cir. 2007).

U.S. 573, 587 (1980).   However, here, law enforcement officers never entered Graham's home to effectuate the arrest.   Indeed, the arrest was made outside of Graham's home, on his front lawn. The Supreme Court in *Payton* drew a line at the entrance to the home.   As the Supreme Court has explained, "[t]he warrant requirement for an arrest in the home is imposed to protect the home." *New York v. Harris*, 495 U.S. 14, 20 (1990).   Because officers did not enter Graham's home to make the arrest, the exigency requirement is not triggered.

Even if the arrest had been made in Graham's home, the arrest was not unlawful because exigent circumstances existed.   First, the officers were in "hot pursuit" of Graham when he entered the house.   *See United States v. Santana*, 427 U.S. 38, 42-43 (1976).   This case is the quintessential "hot pursuit" case.   Minutes after an individual attempted to rob and shot into 1046 Bethune, a law enforcement officer was able to locate the suspect as he was in mid-flight back to his residence.   Law enforcement continued their pursuit of him as he entered his home. Moments later, the police arrived.   This case is very similar to the facts of *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294 (1967), where the Supreme Court held that the entry into a home without a warrant to search for a robber and the subsequent warrantless search for the robber were valid because, under the circumstances of the case, "the exigencies of the situation made that course imperative."   *Id*. at 298 (internal quotation marks omitted).   In *Hayden*, "[t]he police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it."   *Id*.   The Supreme Court held that law enforcement acted reasonably when they entered the house to search for the suspect.   *Id*.   "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."   *Id*. at 298-299.   As in *Hayden*, here, officers believed that the suspect in a shooting could still be armed as he entered 1207 Slater.   As

in *Hayden*, "[s]peed here was essential."   *Id*. at 299.

Second, the officers reasonably believed that evidence could be destroyed if they waited to obtain a warrant before entering 1207 Slater.   When law enforcement officers arrived at 1207 Slater, Graham had rushed upstairs to the bathroom.   When he stuck his head out the window to speak with the officers, he told them he was taking a shower.   Such behavior gave the officers reason to believe that Graham could destroy gunshot residue by washing it off of his hands or clothing.

Lastly, officers were reasonably concerned for the safety of innocent inhabitants of the house.   At the time Graham entered 1207 Slater, officers believed that Graham—an individual suspected of having just shot a 9-year old boy in the abdomen—could still be armed.   Therefore, officers reasonably believed that individuals in the home could be at risk.

Because exigent circumstances existed, law enforcement officers were justified in arresting Graham without a warrant and, therefore, Graham's motion to suppress should be denied.

   **c. Even If Exigent Circumstances Did Not Exist, Because Probable Cause Existed, The Exclusionary Rule Does Not Apply and the Graham's Statement Should Not Be Suppressed.**

Even assuming that such exigency did not exist here, because probable cause existed, the exclusionary rule would not apply.   Graham moves to suppress the statements he made to law enforcement while at the police station.   "Where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the [Government's] use of a statement by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*."   *Harris*, 14 U.S. at 21.   The Supreme Court declined to apply the exclusionary rule in this context "because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like [Graham], protection for

14

statements made outside their premises where the police have probable cause to arrest the suspect for committing the crime." *Id*. at 17.   As the Supreme Court explained, "Nothing in the reasoning of [*Payton*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house." *Id*. at 18.   Just as in *Harris*, because "the officers had probable cause to arrest [Graham] for a crime, [Graham] was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk." *Id*.   Therefore, the Court should deny Graham's motion to suppress his post-arrest statements.

### 2.      Graham's Waiver of his *Miranda* Rights Was Made Voluntarily.

Graham has also moved in boilerplate fashion to suppress the statements he made to the police, contending that the statements were made in violation of *Miranda*, the Fifth Amendment, and the Sixth Amendment.

Statements made to law enforcement must comply with the requirements of *Miranda* and the Due Process Clause of the Fifth Amendment.   *Colorado v. Connelly*, 479 U.S. 157 (1986); *Miranda v. Arizona*, 384 U.S. 436 (1966).   Where *Miranda* rights have been waived, as in this case, the analysis of the voluntariness of the *Miranda* waiver and the voluntariness of the statements under the Due Process Clause is the same.   *United States v. Christobal*, 293 F.3d 134 (4th Cir. 2002).

As the Supreme Court held in *Moran v. Burbine*, a defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Burbine*, 475 U.S. 412, 421 (1986).   To be knowing and intelligent, the waiver must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Christobal*, 293 F.3d at 139-40.   The test for determining whether a statement is

voluntary under *Miranda*, "is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id*. at 140 (internal quotation marks omitted) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)).   To make this determination, courts must consider the "totality of the circumstances," including the characteristics of the Defendant, the setting of the interview, and the details of the interrogation.   *Pelton*, 835 F.2d at 1071.

Coercive police activity is a necessary predicate to a finding that a *Miranda* waiver was involuntary.   *Connelly*, 479 U.S. at 167.   Such coercion has been found where the suspect was subjected to severe physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936); held incommunicado and questioned for over thirty-six hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944); given "truth serums," *see Townsend v. Sain*, 372 U.S. 293 (1963); or threatened with a loaded gun while wounded, *see Beecher v. Alabama*, 389 U.S. 35 (1967).   A deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary.   *See Christobal*, 293 F.3d at 141 (waiver given after suspect had been shot multiple times, undergone emergency surgery, and given pain killers and narcotics found to be voluntary).   "While mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquirty."   *Connelly*, 479 U.S. at 165.

Here, the questioning of the Graham took place at a police station.   Detective Bailey informed Graham of his *Miranda* rights prior to the start of the interview.   Graham signed an Explanation and Waiver of Rights Form, acknowledging that he had "been advised of and understood [his] rights" and "freely and voluntarily waive[d] [his] rights and agreed[d] to talk with the police without having an attorney present."   (Exh. 1).   Graham also initialed next to each

16

right of which he had been advised by Detective Bailey.   When the recorded interview began,

even after the waiver, Lieutenant Simmons ensured that Graham was in fact a willing participant.

Lieutenant Simmons re-read the *Miranda* warnings to Graham and confirmed that he had initialed

next to each one.   At the time of the incident and custodial interview, Graham was 35 years old

and had already amassed considerable experience in the criminal justice system, including arrests

and convictions for serious offenses.   Graham was alert at the time of the interview and had no

apparent difficulty in understanding what was happening or what was being said.   He was neither

injured nor impaired in any way at the time of the interview, and none of the officers present at the

time assaulted Graham or threatened him with violence to persuade him to make any statements.

The interview lasted ninety minutes and, therefore, officers did not subject him to lengthy

interrogation.

In all, there is neither evidence of any coercion, at any time, by the police officers

interviewing Graham, nor any evidence that Graham's will was overborne or his capacity for

self-determination critically impaired.   Accordingly, Graham's motion to suppress his statements

should be denied.

### D.    The Motions to Suppress Search and Seizure Evidence Should Be Denied.

#### 1.    The Search Warrants for 1207 Slater and Graham Are Facially Valid and Supported by Probable Cause.

The Fourth Amendment protects against unreasonable searches and seizures, and mandates

that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized."   U.S.

Const. amend. IV.   Although the concept of probable cause cannot be defined precisely, it

"exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable

prudence in the belief that contraband or evidence of a crime will be found" in the place to be searched.   *Ornelas v. United States*, 517 U.S. 690, 696 (1996).   "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."   *Gates*, 462 U.S. at 232.   Moreover, the Supreme Court has "specifically cautioned against 'hypertechnical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether."   *United States v. Robinson*, 275 U.S. 371, 380 (4th Cir. 2001) (quoting *Gates*, 462 U.S. at 236).   The probable cause standard does not "require officials to possess an airtight case before taking action.   The pieces of an investigative puzzle will often fail to fit in neatly, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information."   *Taylor v. Farmer*, 13 F.3d 117, 121 (4th Cir. 1993).

"Because probable cause is evaluated through a 'totality-of-the-circumstances' analysis rooted in common sense, [the Court] 'must accord great deference to the magistrate's assessment of the facts presented."   *United States v. Monteith*, 662 F.3d 660, 664 (4th Cir. 2011) (internal citations omitted).   The Court's role in reviewing an issuing magistrate's probable cause determination is limited to ensuring that "there was a 'substantial basis for determining the existence of probable cause.'"   *Id.* (*quoting Gates*, 462 U.S. at 238-39).

### a.   The Search Warrant for Graham is Facially Valid and Supported by Probable Cause.

In the instant case, it is clear that given all the facts alleged in the search warrant affidavit, there is probable cause to believe that Graham's blood, saliva, or tissue samples would contain DNA evidence relating to the commission of attempted first degree murder.   The Maryland Circuit Court judge who signed the September 18 Warrant relied on the following facts to

determine that a fair probability existed that evidence of criminal activity would be found using

Graham's DNA:

> (1)     that at approximately 11:53pm, BPD officers responded to 1046 Bethune Road and observed that a 9-year boy had suffered a gunshot wound to his left torso;

> (2)     that an unknown black male had attempted to gain entry into the residence and fired a handgun into the home, striking the boy;

> (3)     that an officer utilizing CCTV cameras in the area of the shooting[4] was able to identify a black male running toward the rear of the 1200 block of Slater Road;

> (4)     that the same officer saw the black male go out of camera area and re-emerge seconds later and continue to run to the rear of 1207 Slater Road and come around in-front of the same;

> (5)     that the male was identified as Kenneth Graham, who was known to the officer from numerous investigations;

> (6)     that Graham was able to enter 1207 Slater Road without a key;

---

[4]     Graham contends that this statement—specifically, that the CCTV cameras were *in the area of the shooting*—was either made in reckless disregard for the truth or a deliberate falsehood because the camera utilized to locate Graham was near the 1200 block of Slater Road, rather than the 1000 block of Bethune Road.   However, when the statement is read as a whole, there is nothing misleading about it.   The affiant stated:   "Officer O'Connor utilizing CCTV cameras located in the area of the shooting was able to identify a black male wearing a red shirt running toward the rear of the 1200 block of Slater Road."   The affiant made clear that Graham was seen near the 1200 block of Slater Road.   Moreover, as the affiant will testify, the camera *was* in the area of the shooting as it was only 0.5 miles away from 1046 Bethune Road.   To the extent that Graham is requesting a *Franks* hearing on this matter, he is not entitled to one because, even absent the statement that the camera was in the area of the shooting, probable cause existed to support the search warrant.   *See United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011) ("To be entitled a *Franks* hearing . . . the accused must make a *substantial* preliminary showing that the false statements were either knowingly or recklessly included in an affidavit support a search warrant and that, without those false statements, the affidavit cannot support a probable cause finding. Thus, if the allegedly false statements are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing.").   Further, Graham fails to furnish any offer of proof as to the affiant's intent; mere conclusory statements about the affiant's intent are insufficient to warrant a hearing, as is a request for a hearing simply to have an opportunity to cross-examine the affiant. *See United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999); *see also United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (holding that a defendant's allegations "must be accompanied by a detailed offer of proof.").

(7)     that one tennis shoe was found inside 1046 Bethune Road and another was found outside the 1100 block rear of Slater Road, and this tennis shoe possibly belonged to Graham; and

(8)     that one handgun was found in the rear of the 1200 block of Slater Road.

*See* Exh. 3.   Together, these facts—particularly the gun and shoe found in Graham's path and the shoe found at 1046 Bethune—provide a substantial basis for the issuing court to conclude that probable cause existed that evidence pertaining to the shooting could be found through Graham's DNA.   The facts show that a black male shot a child late in the night, that a black male was seen running towards his residence, that he ducked out of camera shot briefly before re-emerging, that he then continued to run into his residence, and that in the path that he ran, a gun was found as well as a tennis shoe possibly belonging to him, while another tennis shoe was at the scene of the shooting.   Under these facts and circumstances, there is a substantial basis to support the state court's finding that probable cause existed to believe that Graham was the individual who shot the 9-year old boy and that his DNA could tie him to the gun or shoe found in the path he was seen running along or to the shoe that was found at 1046 Bethune.[5]   Accordingly, Graham's motion to suppress the search and seizure evidence should be denied.

### b.     The Warrant for 1207 Slater is Facially Valid and Supported by Probable Cause.

Similarly, it is clear that given all the facts alleged in the search warrant affidavit for 1207 Slatver, there is probable cause to believe that evidence relating to the commission of attempted first degree murder would be found in Graham's residence, the location to which Graham fled. Contrary to Graham's assertions, this was not an affidavit based solely on a hunch; rather, the

---

[5]      Indeed, the results of the DNA testing that was done indicate that Graham's DNA was present on the shoe left behind at 1046 Bethune.   No genetic material suitable for comparison was found on the gun or the shoe recovered from the rear of the 1100 block of Slater Road.

affidavit contained facts detailing Graham's connection to the shooting.   The Maryland Circuit

Court judge who signed the September 18 Warrant relied on the following facts to determine that a

fair probability existed that evidence of criminal activity would be found in 1207 Slater:

(1)    that at approximately 11:53pm, BPD officers responded to 1046 Bethune Road and observed that a 9-year boy had suffered a gunshot wound to his left torso;

(2)    that an unknown black male had attempted to gain entry into the residence and fired a handgun into the home, striking the boy;

(3)    that an officer utilizing CCTV cameras in the area of the shooting was able to identify a black male running toward the rear of the 1200 block of Slater Road;

(4)    that the same officer saw the black male go out of camera area and re-emerge seconds later and continue to run to the rear of 1207 Slater Road and come around in-front of the same;

(5)    that the male was identified as Kenneth Graham, who was known to the officer from numerous investigations;

(6)    that Graham was able to enter 1207 Slater Road without a key; and

(7)    that one handgun was found in the rear of the 1200 block of Slater Road.

See Exh. 3.   The facts show that a black male shot a child late in the night, that a black male was

seen running towards his residence, that he ducked out of camera shot briefly before re-emerging,

that he then continued to run into his residence, and that in the path that he ran, a gun was found.

A man of reasonable prudence would be able to look to these facts and circumstances to support a

belief that Graham was the individual who shot the 9-year old boy and that evidence relating to the

commission of this crime—such as clothing, ammunition, other firearms, or blood (either

Graham's or the victim's)—would be found at Graham's residence.   See Ornelas, 517 U.S. at

696.   Therefore, these facts—particularly that a gun was found in the path along which Graham

was seen running—are more than sufficient to provide a substantial basis for the issuing court's

decision.   Accordingly, the Court should deny Graham's motion to suppress the search and

seizure evidence.

**2.      The Officers Relied on the Warrants In Good Faith and The *Leon* Good Faith Exception Applies to This Case.**

Even if the Court were to find that the affidavits lacked probable cause in this case, the search should be upheld because the officers had a good faith basis to rely on the search warrants. It is well established that, even where the court ultimately finds a warrant to be invalid, the fruits of the search conducted pursuant to that warrant should not be suppressed "unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."   *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (quoting *United States v. Leon*, 468 U.S. 897 (1984)).   "The deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith within the scope of a search warrant issued by a magistrate.'"   *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 920).   Accordingly, under *Leon's* good faith exception, "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'"   *Id.* (quoting *Leon*, 468 U.S. at 922).   Courts have found an officer's reliance on a warrant objectively unreasonable where:   (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard for the truth; (2) the magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.   *United States v. Hippolite*, 65 F.3d 1151, 1156 (4th Cir. 1995).

Here, reliance on the warrant was objectively reasonable.   Despite the Graham's assertion, the affiant did not provide false or misleading information.   *See supra* at fn. 4.   Further, there is no evidence that the issuing judge abandoned his neutral and detached role or that the warrant was facially invalid, i.e., that the warrant was so lacking in probable cause that the officers' reliance upon it was objectively unreasonable.   *See United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993).   The warrants reflected information as to the shooting, the assailant's description, the suspect (who fit the assailant's description and was seen running late at night not far from the scene of the shooting), and the evidence found in the suspect's path, such as the gun.   Therefore, the evidence seized should not be suppressed, even were the Court to find the warrant invalid.

## IV.   **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the Defendant's pre-trial motions.


Respectfully submitted,

Rod J. Rosenstein
United States Attorneys


By:   _____/s/_____
        Seema Mittal
        Benjamin M. Block
        Assistant United States Attorneys
        36 South Charles Street, Fourth Floor
        Baltimore, Maryland 21201
        (410) 209-4800

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2014, the Government's Omnibus Response to

Defendant Graham's Pre-Trial Motions, and its accompanying exhibits, was electronically filed

and served on opposing counsel using CM/ECF.


_____/s/_____
Seema Mittal